Filed 8/28/23  P. v. Nilo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>FABIAN JESUS NILO,<br><br>　　　Defendant and Appellant. | F083308<br><br>(Super. Ct. No. PCF380666A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2019, defendant Fabian Jesus Nilo stabbed and killed Roman Gomez because Roman was abusing his cousin, Angela M.[1]  In 2021, a jury convicted defendant of second degree murder (Pen. Code, § 187, subd. (a), count 1)[2] and found true the allegation he used a knife during the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced defendant to an indeterminate term of 36 years to life.  This case proceeded to trial in April 2021, in the midst of the COVID-19 pandemic, at a time where masking, social distancing, and plexiglass dividers were the norm in the courtroom.

On appeal, defendant contends the trial court prejudicially erred:  (1) in finding Angela was an unavailable witness, when she and her son were experiencing COVID-19 symptoms, and then reading her prior testimony into this trial; and (2) in denying his motion to impeach Angela's testimony with her prior misdemeanor conviction for a hit and run (Veh. Code, § 20002, subd. (a)) because it improperly considered the specific circumstances of the conviction.  Further, defendant contends the trial court abused its discretion by denying his invitation to dismiss both his prior strike and prior serious felony (§ 667, subd. (a)(1)) pursuant to *Romero*[3] and section 1385, because it failed to consider all relevant factors before making its determination.

Although we conclude the trial court erred in considering the specific circumstances of Angela's prior hit and run conviction, we conclude defendant was not prejudiced by this error.  We further conclude the trial court properly exercised its discretion in concluding Angela was an unavailable witness based on its finding that her and her son were experiencing COVID-19 symptoms.  As to defendant's final contention,

---

[1]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[2]    All further references are to the Penal Code, unless otherwise stated.

[3]    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

we conclude the trial court properly exercised its discretion when it refused to strike both his prior strike and his prior serious felony (§ 667, subd. (a)(1)) pursuant to *Romero* and section 1385. Accordingly, the judgment is affirmed.

## STATEMENT OF CASE

On November 1, 2019, the Tulare County District Attorney filed an information charging defendant with the first degree murder (§§ 187, subd. (a), 189, count 1) of Roman, with the allegations he personally used a deadly and dangerous weapon, to wit, a knife during the commission of the offense (§ 12022, subd. (b)(1)) and that he suffered a prior strike adjudication for robbery (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d), 211).

In 2020, this matter proceeded to a jury trial where defendant was represented by trial counsel. The jury hung as to count 1 and all related lesser included offenses. The trial court subsequently declared a mistrial and discharged the jury. During this trial, the People called Angela as a witness, who testified and was cross-examined by trial counsel.

On April 23, 2021, during a retrial where defendant was represented by the same trial counsel, a jury convicted defendant of second degree murder (§ 187, subd. (a), count 1) and found true the allegation he personally used a knife during the commission of the offense (§ 12022, subd. (b)(1)). The jury found defendant not guilty of first degree murder (§§ 187, subd. (a), 189, count 1). In a separate court trial, the trial court found true that defendant had suffered a robbery conviction (§ 211), which qualified both as a prior strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a prior serious felony (§ 667, subd. (a)(1)).

As to count 1, the trial court sentenced defendant to 15 years to life, doubled to 30 years to life because of the prior strike, and imposed consecutive terms of one year for the weapon enhancement (§ 12022, subd. (b)(1)) and five years for the prior serious felony (§ 667, subd. (a)(1)). The total aggregate term imposed was 36 years to life.

3.

## SUMMARY OF FACTS

### I. Background

In 2019, Angela and Roman were in a dating relationship and lived together in a house in Tulare. During their relationship, they "would argue sometimes. [They] would fight. When [Roman] would drink more is when … he got aggressive." Roman "would raise his voice to [Angela]. He started putting his hands on [her]."

In April 2019, Angela and Roman got into a fight. In response, defendant told his girlfriend, Kayla B.,[4] he was going to " 'go all out' " against Roman. Additionally, on May 5, 2019, Gomez was arrested for abusing Angela. Subsequently, on May 7, 2019, Angela texted defendant to inform him that Roman was being released from jail. Defendant texted Angela telling her that Roman's continuous abuse would not be tolerated and he would " '[m]ake shit clear to him.' " Specifically, defendant told Angela that if the abuse continued "he was going to handle it. He was going to hurt [Roman]."

### II. May 20, 2019 Incident

#### A. Events Prior to the Stabbing

On the night of May 20, 2019, Angela and Roman were together at the house. Kayla R. and Aaliyah, who are married, came over to the house and the four of them started drinking alcohol and playing cards. At or around 10:30 p.m., Kayla R. and Aaliyah left the house and thereafter, Angela and Roman drove to the store.

During the drive, Angela and Roman got into a physical confrontation. Roman "threw his hands over [Angela's] neck … and he got aggressive … because he had been drinking." Subsequently, they both drove home and Angela went straight to her room. Roman followed her and "put his hand on [Angela's] chest, like, right … on [her] neck" and then "started grabbing [her] by [her] throat again and threw [her] against the wall."

---

**4** Because Kayla B. and Kayla R. both share the same first name, we will include the first initial of their last name throughout the entirety of this opinion.

As a result, Angela's "neck was red from where [Roman] was grabbing [her]" and she had a bruised arm, which stayed bruised for "a good six months because of when he was grabbing [her]."

Roman eventually left but came back to the house to "grab[] his backpack, and he grabbed his clothes." During this time, Kayla R. called Angela and asked her what she was doing "and that's when [Roman] grabbed the phone and he hung it up." Kayla R. "called back, and he didn't answer it."

Subsequently, Kayla R. and Aaliyah returned to the house and began "arguing with [Roman] and they were telling him to leave."[5] They both got on their phones and began making calls. Roman then left, and Kayla R. and Aaliyah followed him out of the house. The women then got into Kayla R.'s gray Nissan Altima and drove off. Angela remained at the house.

At or around this time, defendant, Kayla B., and Caesar Lemus were in the Goshen area when defendant received a call from Aaliyah causing him to become "very upset." Defendant responded that "he was going to get Roman." Kayla B. heard defendant tell Aaliyah he had knife, but she never saw it. At or around 1:20 a.m., defendant messaged Angela telling her he was " 'OMW,' " which Angela understood as "[o]n my way." Eventually, defendant told Angela over the phone he was going to "handle it."

Defendant, Kayla B., and Caesar drove over to Angela's house in an SUV. After they arrived at the house, defendant jumped out of the car and "gave [Angela] a hug and said that he had to do what he had to do and then he left." Defendant then left with Kayla B. and Caesar.

---

[5]     A third girl by the name of Sadie was also with them.

## B. The Stabbing

Defendant, Kayla B., and Caesar located Roman near a park. Defendant and Caesar exited the car and defendant told Roman, " 'I told you not to hit my prima,' "[6] and attacked him. Roman was stabbed at some point during the attack.[7] Subsequently, Kayla R. drove up in her car and hit two of the three individuals involved in the altercation, including Roman. Kayla R. yelled, " 'Let's go. Let's go,' " and Aaliyah exited the car and kicked Roman in the head. Kayla R. started "[e]gging it on" and told defendant and Caesar, " 'That's all you've got? [Roman] doesn't deserve to be here.' " Defendant, Kayla B., and Caesar then drove off. On the way back to the house, defendant "was still upset that he wanted to do more, but … they said they got him good or something."

## C. Events After the Stabbing

Later on, defendant returned to Angela's house without a shirt. Angela noticed defendant had "a little bit of blood" "[b]y his stomach area." She also observed a "handle hanging out of his pocket like it was a pocket knife or something."[8] Defendant was breathing heavily and appeared upset and told Angela "he had to do what he had to do and he was going to leave. That he was sorry." Defendant then texted his half brother Ramon T. and asked him to pick him up.

## D. Subsequent Law Enforcement Investigation

Roman called 911 and reported he had been stabbed, but was unable to identify the attackers. Law enforcement arrived on scene and found Roman sitting on the curb with "a laceration on the left side of his chest just underneath his nipple area." Roman

---

**6** "Prima" is Spanish for cousin.

**7** During the trial, the People introduced video surveillance that purportedly showed defendant with a shiny object in the middle of his waistband.

**8** Angela only observed the handle, but "assumed it was a knife."

believed " '[s]even' " people attacked him. He was then transported to the hospital, where he ultimately died.[9] No knife was recovered from the scene.[10]

Subsequently, law enforcement located surveillance footage from a nearby school and residence. In the surveillance footage, defendant and Caesar are observed exiting the SUV. At this point, defendant and Caesar approach Roman and "beg[in] fighting" him, but Roman did not fight back. Defendant is then observed in the footage with a shiny object in the middle of his waistband.

On May 22, 2019, officers conducted surveillance at a residence in Visalia. The officers observed defendant, Kayla B., and two other males—later identified as Ramon and Jose T.—exit an apartment and enter a white Hyundai sedan. Defendant sat in the rear driver's side seat and Kayla B. sat in the rear passenger side seat, whereas Ramon sat in the driver's seat and Jose sat in the passenger seat. At this point, defendant and Kayla B. were arrested. Officers noticed defendant had a swollen right hand.

Officers then searched the Hyundai and located an Alcatel cell phone in the rear part of the vehicle.[11] Further, officers located a pocketknife in the driver's door pocket, but did not believe this was the same knife used to stab Roman. Ramon further testified he owned both the Hyundai and the pocketknife.

---

[9]     Dr. Walter testified the cause of death was "[a] result of sharp-force trauma to the heart" caused by being stabbed.

[10]     Additionally, Roman told EMT R. Reynolds he did not see a knife during the attack.

[11]     Law enforcement performed a forensic extraction of the black Alcatel cell phone and determined it belonged to defendant.

## DISCUSSION

**I.** **The Trial Court Properly Admitted Angela's Prior Testimony Because She was an "Unavailable Witness" Pursuant to Evidence Code Section 240**

Defendant contends the trial court prejudicially erred in finding Angela "unavailable" pursuant to Evidence Code section 240 and subsequently admitting Angela's testimony from his prior jury trial. Specifically, defendant argues that in order to "preserve [his] right to confront" Angela, the trial court should have trailed the trial for one day to determine whether Angela tested positive for COVID-19.[12] We disagree.

### A. Additional Factual Background

On the morning of April 16, 2021 (Friday), during the prosecutor's case-in-chief, the prosecutor informed the trial court Angela "and her children are having COVID symptoms and they have a COVID test set for Monday [April 19, 2021] at 10:00." The trial court decided "to wait for the COVID test before we bring them in." At end of the day, the trial court, the prosecutor, and trial counsel had the following exchange:

> "[PROSECUTOR]: … And I don't know what [Angela's] status will be, so I may be filing a motion, potentially, that she's not—if she's not available, to use prior testimony. She has testified in trial subject to cross-examination previously, but I don't know where we're at until I know that I hear from her.
>
> "THE COURT: Do you know if she's getting a test where she's going to know very quickly whether or not she's positive?
>
> "[PROSECUTOR]: Do you mind if I use my cell phone and call [Angela's attorney]? I asked her earlier and she didn't have an answer [f]or me. [¶] … [¶]
>
> "[PROSECUTOR]: Yeah. So [Angela's attorney] sent me a screen shot that she received from [Angela]. It's very blurry. I can't read it. I'm sure she probably shouldn't have necessarily shared it with me, but she

---

[12] As we discuss in detail below, trial counsel objected to the trial court's finding Angela was an unavailable witness. Therefore, we find defendant preserved this issue and address the merits of this argument in this appeal.

knew the reason why she was, and it's her client.  So I don't think there's any issue.  She's calling me back.

"(Break in proceedings)

"THE COURT:  She's going to work on it.

"[PROSECUTOR]:  She's going to call [Angela] and see if she can get an answer for you.  The information that she received as well does not give any clue as to what it's going to be.

"THE COURT:  Well, I just—all I'm saying is that I would like for you to be—to try to find out so that you know what's going to happen on Monday.  One way or the other, we'll do whatever we have to do, but I think we need to get that information before.  So I want to make sure to prepare you and get that information before we decide what's going on.  [¶] … [¶]

"THE COURT:  Well, we'll just have to play it by ear is all I can say.  We have to do what we have to do from there.  So I can't make a decision about something I don't have facts for.  So hopefully, between now and Monday you'll have more information and we can figure out where we're going from here.

"[PROSECUTOR]:  And again, since I did bring it up, is the Court and counsel going to require a written motion for unavailability if that is the—

"[TRIAL COUNSEL]:  Yes.

"[PROSECUTOR]:  I just wanted to make sure.

"[TRIAL COUNSEL]:  I'm most likely going to oppose it.

"[PROSECUTOR]:  Yes.  I understand that.  So we may need to consider other remedies as well if that is the situation.  So if we can brainstorm—

"THE COURT:  You guys put your papers forth and I'll make a ruling.  That's all I can tell you."

Subsequently, on April 19, 2021 (Monday), the following exchange occurred between the trial court, the prosecutor, and trial counsel regarding Angela's unavailability:

9.

"[PROSECUTOR]: Your Honor, I did ask [Angela's attorney]. She told me over the weekend. I notified counsel and your clerk that it was her understanding that she talked to [Angela] again and she is not getting a rapid test. So I did submit an unavailability motion, and I know counsel filed a response.

"[TRIAL COUNSEL]: I haven't filed it.

"[PROSECUTOR]: Counsel has a response.

"[TRIAL COUNSEL]: I do have a copy though.

"[PROSECUTOR]: And I have a signed copy as well that I can provide to the Court. I have asked her to double check this morning to please, just in the off chance it is—ends up being a rapid test that we can get a response. Otherwise, once we get that answer, I'm going to need—we're going to have to address that issue before we can move too far along.

"THE COURT: Okay. Let me ask you this. Why can't we just go on and go through whatever witnesses you have, and if it comes back positive, obviously, you're going to have to be able to have her as an unavailable witness. If it doesn't come back positive, she can come back and testify in two to three days.

"[PROSECUTOR]: The thing is I think we should be mostly done outside of her today.

"[TRIAL COURT]: Do you have a defense that you want to present?

"[TRIAL COUNSEL]: I have two witnesses that combined will be less than an hour.

"THE COURT: Okay. What we will do is finish your trial to the extent that we can, and—without you resting, obviously. We will allow defense to put their witnesses on, and then we will basically probably come back on Thursday [April 22, 2021]."

Later on in the afternoon, the following relevant exchange occurred:

"[PROSECUTOR]: … I talked to [Angela's attorney] during the lunch hour. She asked her client about getting a rapid test before she went in, and she went in and said, 'Can I get a rapid test?' And they said, 'We'll get your results to you in two to three days.['] So she clearly did not get a

10.

rapid test.  We have one witness[] tomorrow morning, one from defense I'm being told, and we'll be dark until Thursday morning.

"THE COURT:  I figured Thursday, because I don't want them to come back on Wednesday when it's a two or three-day type of deal.

"[TRIAL COUNSEL]:  I did secure my witnesses.  I did speak with them over lunch and they are both available next week.

"[PROSECUTOR]:  I spoke with [Angela's attorney] about Thursday, that if she gets her results—she needs to get back to us.  If she's negative, she needs to be back here Thursday.  If she's positive, she needs to let us know, and I don't know if the child comes back positive.  I don't know how that affects.

"THE COURT:  If the child comes back positive, I'm not going to have her be in the courtroom.  [¶] … [¶]

"THE COURT:  Hopefully, it won't be an issue and we'll cross that bridge if we get there.

"[PROSECUTOR]:  From what I'm being told, I expect negative results based on the symptoms that were told to me."

On April 22, 2021 (Thursday), the following relevant exchange occurred between the trial court, the prosecutor, and trial counsel:

"THE COURT:  Okay.  [Trial counsel], I'm sure [the prosecutor] told you what's going on.  [Angela] has dropped off as far any kind of contact whatsoever.

"[PROSECUTOR]:  Well, Your Honor, she—we got notice this morning.  She still has a bad cough.  Her throat is better.  She's hoping that she would get a result some time today.  Didn't tell her when.  I asked about the child as well.  [Angela's attorney] told me it's her son.  He is still vomiting, has diarrhea, and was ordered quarantined to the 26th by his school, and she doesn't have results for him.

"THE COURT:  In light of all these factors, I'm going to proceed with a reader.  I do find that the witness is unavailable directly because of illness or indirectly because of exposure to COVID or both.  So in light of these factors, I think we've done everything we can do, and I don't want to put the trial off so we can't finish it.  We have other witnesses.

"Do we have other witnesses?

11.

"[TRIAL COUNSEL]: Just for the record, I'm asking to continue to trail her testimony since she may be getting a result today. And obviously, ideally we would prefer to have her here, and at the last trial that she testified in, the People weren't pursuing a theory of aiding and abetting. So I—you know, it's my position that I have a different motive when I cross her in this trial versus the last trial.

"THE COURT: And I understand that, but I don't think that the difference—I think that the idea is that if you've had a chance to cross-examine them, then whatever you cross-examine them on is what you're stuck with if they are not available. So I'm still—over your objection, I'm going to have the testimony read into the record."

At this point, Angela's August 18, 2020 testimony was read into the record.[13]

## B. Applicable Law

"A criminal defendant has a state and federal constitutional right to confront witnesses, but the right is not absolute. If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial. In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440 (*Sánchez*).)

Evidence Code section 1291 provides, in pertinent part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] … [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) Evidence Code section 240, in turn, states, a witness may be unavailable if he or she is "unable to attend

---

**13** Angela testified on August 18, 2020, in a prior jury trial wherein defendant was the accused and trial counsel represented defendant.

or to testify at the hearing because of then-existing physical … illness or infirmity." (*Id*., § 240, subd. (a)(3).)

To satisfy Evidence Code section 240, subdivision (a)(3), "the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his [or her] testifying, relatively impossible and not merely inconvenient." (*People v. Gomez* (1972) 26 Cal.App.3d 225, 230.) However, the "statute requires no showing of reasonable diligence to produce the witness when the witness's illness or infirmity is the cause of the absence [because] [t]o require proof of reasonable attempts to secure the attendance of a witness who, in any event, could not come to court even if subpoenaed would be an asinine bow to futility." (*Id*. at p. 228.)

Defendant's challenge to the admission of Angela's August 18, 2020 testimony requires us to review both the question of fact—whether the People established by a preponderance of the evidence her COVID-19 symptoms and exposure to the virus rendered her unavailable—and a question of law—whether under these specific circumstances defendant's right to confront Angela was violated.

"The standards of review for questions of pure fact and pure law are well developed and settled. … [A]n appellate court reviews findings of fact under a deferential standard …, but it reviews determinations of law under a nondeferential standard, which is independent or de novo review." (*People v. Cromer* (2001) 24 Cal.4th 889, 893–894; see *Sánchez, supra*, 63 Cal.4th at p. 440 ["The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially."].)

C.     Analysis

Defendant's primary argument is that Angela was not "unavailable" for purposes of Evidence Code section 240 and the trial court erred in admitting her prior testimony because she *could* have become available a day later due to a possible negative COVID-

13.

19 test. Substantial evidence supports the trial court's finding Angela was " 'unavailable as a witness' " within the meaning of Evidence Code section 240, subdivision (a)(3) due to "physical … illness or infirmity."

At the outset, although not necessarily required, we nevertheless conclude the prosecutor made reasonable and good faith efforts in attempting to secure Angela's presence. (*People v. Gomez*, *supra*, 26 Cal.App.3d at p. 228.) The prosecutor was in constant contact with Angela's attorney and did everything in his power to produce Angela at trial. The prosecutor filed an unavailability motion and indicated to the trial court Angela "ha[d] been duly served for trial" and that both Angela's attorney and Angela "ha[d] maintained contact with the People throughout the pendency of the case." Additionally, the prosecutor represented that Angela "appeared as required previously and her attorney has continuously assisted in ensuring that [Angela] make her appearances when necessary." The only reason for Angela's absence was that she was ill and awaiting results of a COVID-19 test. Accordingly, we conclude the prosecutor made a " 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain [Angela's] presence at trial." (*Sánchez*, *supra*, 63 Cal.4th at p. 440.)

Second, there was sufficient competent evidence to support the trial court's finding Angela was physically ill or infirm within the meaning of Evidence Code section 240, subdivision (a)(3). On April 16, 2021 (Friday morning), the prosecutor informed the trial court Angela and her children were having COVID-19 symptoms, and that they had a test scheduled for April 19, 2021 (Monday). On April 19, 2021 (Monday morning), the prosecutor updated the trial court and stated he filed an unavailability motion indicating "it [would] take 2-3 days for [Angela's] results to be received." The trial court suggested the parties move forward with the trial and allowed both the prosecutor and trial counsel to finish up with their witness and "if [the result] comes back positive, obviously, [the prosecutor is] going to have to be able to have her as an unavailable witness. If it doesn't come back positive, she can come back and testify in

two to three days," which would be at or around Thursday, April 22, 2021. Subsequently, on April 22, 2021 (Thursday), after both the prosecutor and trial counsel completed their case-in-chiefs, the prosecutor informed the trial court Angela "still ha[d] a bad cough" and her son "is still vomiting, has diarrhea, and was ordered quarantined to the 26th by his school, and she doesn't have results for him." Based on this information, the trial court concluded Angela "is unavailable directly because of illness or indirectly because of exposure to COVID or both." Trial counsel objected and "ask[ed] to continue to trail [Angela's] testimony since she may be getting a result today." The trial court overruled trial counsel's objection and proceeded to have Angela's testimony read to the jury.

As defendant recognizes, "the Covid-19 pandemic presented a number of unique challenges to criminal courts, and that courts had to adapt to a number of emergency rules implemented by both the Governor and the Judicial Council." With that being said, defendant argues the trial court erred by failing to "trail the trial for even a single day in order to preserve [his] right to confront witnesses." However, even assuming Angela's test result came back negative, it would have been irresponsible for the trial court to require her physical presence a day later because her son also had COVID-19 symptoms of vomiting and diarrhea, and was ordered quarantined from school until April 26, 2021. Based on these unusual circumstances, the trial court altered the trial schedule allowing for both parties to complete their case-in-chiefs, which provided time for Angela's symptoms to possibly subside. The trial court did its best to balance the interests of both defendant's confrontation rights under the Sixth Amendment and the safety and health of all parties in the courtroom. For the trial court to require Angela's personal presence on April 22 and possibly expose an entire courtroom, including the jury, to the COVID-19 virus at the height of the pandemic would have been an irresponsible decision. Therefore, the trial court's finding Angela was unavailable because both her and her son were experiencing COVID-19 symptoms made her attendance "relatively impossible and

15.

not merely inconvenient" for purposes of Evidence Code section 240, subdivision (a)(3).[14] (*People v. Gomez, supra*, 26 Cal.App.3d at p. 230.) In light of our conclusion, we do not address the parties' dispute over whether the alleged error was prejudicial.

## II. Angela's Prior 2017 Misdemeanor Conviction for a Hit and Run (Veh. Code, § 20002, subd. (a))

Defendant further contends the trial court prejudicially erred in excluding Angela's prior misdemeanor hit and run conviction (Veh. Code, § 20002, subd. (a)) from 2017. Specifically, defendant argues the trial court improperly "considered the specific circumstances of [Angela's] prior hit-and-run conviction rather than [applying] the least adjudicated elements" test set forth in *People v. Castro* (1985) 38 Cal.3d 301 (*Castro*).[15] We agree with defendant that the trial court erred, but conclude defendant was not prejudiced by this error.

### A. Additional Factual Background

Prior to the trial, the prosecutor moved to exclude reference to Angela's prior misdemeanor conviction for a hit and run (Veh. Code, § 20002, subd. (a)) because it did not qualify as a crime involving moral turpitude. At the subsequent hearing, trial counsel acknowledged the hit and run conviction is not a crime involving moral turpitude, but

---

[14] Although not addressed by either party, Angela's August 18, 2020 testimony was properly admitted as "prior testimony" pursuant to Evidence Code section 1291, subdivision (a)(2). Here, Angela testified at defendant's previous trial and trial counsel " 'had the right and opportunity to cross-examine [her] with an interest and motive similar to that which he ha[d] at the hearing.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 340–341; see *People v. Carter* (2005) 36 Cal.4th 1114, 1173–1174 [holding "the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution"].)

[15] As we discuss in detail below, trial counsel argued for Angela's conviction to be admitted for impeachment purposes because it qualified as a "crime of dishonesty." Therefore, we find defendant preserved this issue below and address the merits of his argument in this appeal.

argued it qualified as a "crime of dishonesty." Specifically, trial counsel stated the following:

> "And while it's not a crime of moral turpitude because there's no injury or damage to property, a trial court still has discretion under—if a crime is one of dishonesty to allow the facts to come in, and I think with a hit and run, naturally, there's dishonesty involved. You're avoiding responsibility by leaving a possible crime scene. So I would ask the Court to use their discretion in that it is a dishonest crime, and here she is as a witness [] and she's an important witness to the People's case. The jury should be allowed to know if she's committing and been convicted of a crime of dishonesty."

The prosecutor stated the offense "may have some dishonesty as an aspect of it, but there is also explanations for it, because [Angela] is clearly also intoxicated in this matter when this happened, and it was a conviction of a [Vehicle Code section] 23152 (b) as well." The trial court excluded reference to Angela's hit and run conviction "[i]n light of the overlying DUI."

### B. Applicable Law

A witness may be impeached with prior convictions involving "moral turpitude," subject to the trial court's exercise of discretion under Evidence Code section 352 to exclude evidence of prior convictions, if the prejudicial impact of the evidence does not outweigh its probative value. (*People v. Clark* (2011) 52 Cal.4th 856, 931–933; *Castro*, *supra*, 38 Cal.3d at p. 306.) Moral turpitude is defined as a " 'general readiness to evil,' " from which a readiness to lie can be inferred. (*Id*. at p. 315.) In determining whether a crime involves moral turpitude, the trial court looks to the statutory definition of the particular crime to determine whether "the least adjudicated elements of the conviction necessarily involve moral turpitude" (*id*. at p. 317), that is, whether the elements of the crime, without reference to the specific circumstances of the conviction at issue "necessarily evince any character trait which can reasonably be characterized as 'immoral' " (*id*. at p. 317, fn. 13).

17.

In exercising its discretion under Evidence Code section 352 when determining whether to admit a prior conviction for impeachment purposes, the trial court should consider " '(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions.' " (*People v. Green* (1995) 34 Cal.App.4th 165, 182, quoting *People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.) The trial court's discretion to admit or exclude impeachment evidence is broad, and a reviewing court ordinarily will uphold the trial court's exercise of that discretion. (*People v. Collins* (1986) 42 Cal.3d 378, 389.)

## C.   Analysis

Here, rather than applying the "least adjudicated elements" test (*Castro*, *supra*, 38 Cal.3d at p. 317), to determine whether a misdemeanor hit and run (Veh. Code, § 20002, subd. (a)) conviction is a crime involving moral turpitude, the trial court instead considered the specific circumstances of the conviction when it excluded the evidence based on "the overlying DUI." This was error and an abuse of discretion.[16] (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 ["The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action ....' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion."].)

Although the trial court erred in considering the specific circumstances of Angela's misdemeanor hit and run conviction, we conclude defendant was not prejudiced

---

[16]   Because we conclude the trial court erred by failing to apply the "least adjudicated elements" test, we do address the issue of whether a misdemeanor hit and run (Veh. Code, § 20002, subd. (a)) conviction is a crime involving moral turpitude.

under the reasonable probability standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).[17]  Angela testified under a grant of immunity from the prosecution and trial counsel argued in closing argument she was "not a credible witness" because "she [was] scared of stepping out of line" of the immunity agreement, which in turn made her testimony inconsistent.  These issues had a much greater bearing on Angela's credibility as a witness, rather than a single misdemeanor conviction.  Additionally, most of Angela's testimony was corroborated by Kayla B.  Accordingly, it is not reasonably probable defendant would have received a different result had the jury been informed of Angela's 2017 misdemeanor hit and run conviction.

## III.   <u>Cumulative Prejudice</u>

Defendant further contends he was prejudiced by the cumulative effect of the alleged errors.  However, we have concluded there was only a *single* error that was not prejudicial.  There are no other errors to cumulate and therefore defendant is not entitled to relief.  (*In re Reno* (2012) 55 Cal.4th 428, 483; *People v. Valdez* (2012) 55 Cal.4th 82, 181 [holding that "[t]o the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted.  The same conclusion is appropriate after considering their cumulative effect"].)[18]

---

[17]   Defendant contends the exclusion of this evidence violated his right to confrontation under the Sixth Amendment and rendered his trial fundamentally unfair in violation of federal due process rights, and therefore we should evaluate prejudice under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.  We disagree and apply the *Watson* standard of prejudice.  (See *People v. Blacksher* (2011) 52 Cal.4th 769, 821 [" 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' "]; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right."].)

[18]   Alternatively, assuming the claims were not preserved for appeal, defendant makes a number of additional claims of ineffective assistance of counsel related to the various contentions discussed above.  "Because we have addressed the merits of the

19.

## IV. The Trial Court Failed to Properly Address Defendant's Invitation to Dismiss His Prior Strike and Prior Serious Felony

Defendant further contends the trial court abused its discretion in denying his invitation to dismiss his prior strike conviction and his prior serious felony conviction (§ 667, subd. (a)) pursuant to *Romero* and section 1385. Specifically, defendant argues the trial court failed to properly weigh his background, the nature and circumstances of the instant offense, and the nature and circumstances of the prior offense before denying relief. We disagree.

### A. Additional Factual Background

On September 8, 2021, trial counsel filed a *Romero* invitation arguing for dismissal of his prior juvenile strike. This invitation included a letter from a social worker, who reviewed defendant's: (1) prior interviews; (2) prior juvenile criminal cases; and (3) records from the Tulare Youth Services Bureau, the National Center for Mission and Exploited Children, and the Tulare County Health and Human Services Agency. Specifically, trial counsel argued dismissal was appropriate based on his young age, his difficult upbringing, and the nature and circumstances of the prior strike. The People did not file a response, but did file a statement in aggravation arguing for "defendant to serve the maximum allowable sentence," which was 36 years to life. The trial court considered the papers and arguments from counsel, and subsequently sentenced defendant without addressing the *Romero* issue. Specifically, the following relevant exchange occurred between the trial court, the prosecutor, and trial counsel:

> "THE COURT: Any other comments you wish to make?
>
> "[TRIAL COUNSEL]: Yes, but if I'll go first. Obviously the Court's real decision is whether or not they're going to strike the strike and

---

underlying contentions and have concluded, above, that the actions at issue were not erroneous or improper … or that any alleged error was not prejudicial, defendant's related claims of ineffective assistance of counsel fail and do not require further discussion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

20.

impose the nickel and obviously [defendant] was convicted of a second degree murder, which is the most serious crime someone can commit and it's not common for a strike to be stricken in these sort of circumstances. But, the Court still has the discretion to do so. And I think that this can be one of those unusual cases where a strike is stricken, even though the underlying crime is so serious.

"I provided an extensive history of [defendant's] childhood and involvement with [Child Welfare Services] and the foster system. And both his underlying strike and the conviction are I think deeply connected to his experience as a child and as an adolescent. The strike was committed when he was a minor, he was sent to a group home outside of this county away from his friends and family.

"THE COURT: I read the report, so I'm familiar with it.

"[TRIAL COUNSEL]: Okay. And the conduct was to get him—the motive for his conduct was to come back to Tulare County where his friends and family was.

"The [section] 187 in this case, as I noted, are included in some of the documents, [defendant] had, as a child, had an environment where domestic violence was common. He was young, he wasn't able to stop these adult figures abusing his mother. And he's now confronted as an adult with a very similar situation where his cousin is now the victim of a domestic violence relationship and obviously the actions in May triggered something in [defendant] that caused him to do what he did.

"But all of—both the strike and this conviction are both rooted in his childhood experience. And 16 to life is what the Court would impose if they strike the strike. It's not a light sentence for this sort of conduct, it's what the [L]egislature recommends if someone doesn't have a strike. So I understand that striking the strike is unusual, but 16 to life for this kind of conduct I don't think is inappropriate. So that's what we're asking for. [¶] … [¶]

"[PROSECUTOR]: I would note that in this case we have a situation and just to remind the Court that [defendant] is the primary aggressor. Was convicted of using a knife, which the Court was able to see this attack that occurred. He sought out his victim and had made prior warnings that something was going to happen and that came out during the trial. So this was not a mistake. This was something that clearly was intentional and that was thought out by [defendant].

"He was on parole at the time for his strike offense for the robbery. I was not planning to get into the facts of that, but they were brought up in counsel's moving papers and just recently, a few minutes ago, counsel brought up that [as] well, he was motivated to see his mom and he didn't want to hurt anybody here, he's motivated to help his cousin. But the simple fact is, in the first case, the robbery, he bound an employee with other people and held a knife to that person. That's an egregious, awful incident[.] [¶] … [¶] And in the current case, the situation that was a problem was over and he sought out his victim. So there's no active protection, there's nothing there to suggest that his motive is this altruistic or based on his past. It was something he wanted to do and he took steps to effectuate what he wanted in each of those situations. They're very similar.

"By definition this is a serious and violent offense, exactly as his prior strike. I would note that in counsel's supporting documents and things that were submitted by the defense, the social history aspect, yes, he had a rough upbringing. No one is going to deny that and that was not good. But it also leaves out his criminal conduct and doesn't address what you can see in the probation report of increasing felony conduct of substantial and concerning issues and violence that is occurring as he gets older and older and he does need to be held accountable for that. That's why we have the three strikes law and that's why the nickel and the extra time is appropriate here.

"I'm going to ask that the Court hear from a couple of family members and a few others who are not able to be there today will have their statements read in. Because of the limitations through zoom I've asked somebody else to read them in for the court reporter and copies have been provided to counsel and the Court.

"But I would just note that while [defendant] may have had this rough upbringing or may have had a lot of problems, we've seen no remorse whatsoever from him and the impact that his actions have had on the lives of others is insurmountable for some of them. And I would ask that they be allowed to read their statements and I'd ask the Court to impose the max of 36 to life.

"[*Trial court hears from multiple family members of Roman*]

"THE COURT: All right. In case PCF380666A, defendant's application for probation is denied. The defendant is committed to state prison for 30 years to life, pursuant to [section] 1170.[12] of the Penal Code, plus an additional and consecutive one year pursuant to [section] 12022[, subdivision] (b)(1) and an additional and consecutive five years,

22.

for a total of 36 years to life.  With credit for 841 days spent in custody awaiting sentencing, credits in the amount of 125 days pursuant to [section] 2933.1, for a total of 966 days."

## B.  Applicable Law

"If a defendant has one prior serious or violent felony conviction as defined in subdivision (d) that has been pled and proved, the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony conviction." (§ 667, subd. (e)(1).)  The intent of the Three Strikes law is " 'to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses.' " (*People v. Strong* (2001) 87 Cal.App.4th 328, 337 (*Strong*).)  The Three Strikes law "was intended to restrict courts' discretion in sentencing repeat offenders" (*Romero*, *supra*, 13 Cal.4th at p. 528), and establishes a sentencing norm for longer sentences for repeat offenders, "carefully circumscrib[ing] the trial court's power to depart from this norm," requiring the trial court to explicitly justify its decision to depart from this norm (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*)).  "In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Ibid*.)

However, the trial court retains jurisdiction to dismiss or strike one or more of a defendant's prior strike convictions, "subject, however, to strict compliance with the provisions of section 1385 and to review for abuse of discretion." (*Romero*, *supra*, 13 Cal.4th at p. 504.)  The trial court must determine whether "in light of the nature and circumstances of [a defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, *supra*, 17 Cal.4th at p. 161; see *Strong*, *supra*,

23.

87 Cal.App.4th at p. 336 [the "spirit" of a law refers to the general meaning or purpose of the law].)

We review a trial court's denial of a *Romero* invitation for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) Further, as with our review of a decision on a *Romero* invitation, "[w]e review a court's decision to deny a motion to strike a five-year prior serious felony enhancement for an abuse of discretion." (*People v. Shaw* (2020) 56 Cal.App.5th 582, 587.) Under this deferential standard, the burden is on the defendant " ' "to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Carmony*, at pp. 376–377.) However, an abuse of discretion may be found where a trial court considers impermissible factors, and, conversely, does not consider relevant ones. (*Id*. at p. 378.)

### C.    Analysis

Here, after hearing argument from trial counsel and the prosecutor, the trial court *immediately* proceeded to sentencing without ever addressing defendant's invitation to strike his prior strike conviction or prior serious felony pursuant to *Romero* and section 1385. Although the trial court failed to address its discretion under *Romero*, our Supreme Court has reaffirmed that a trial court's silence does not establish a basis for reversal. (*In re Coley* (2012) 55 Cal.4th 524, 560 ["although a trial court is required to state on the record its reasons for striking a prior conviction [citation], there is no similar statutory requirement of an on-the-record statement of reasons when a court declines to strike a prior"]; *Carmony*, *supra*, 33 Cal.4th at p. 378 [" 'On a silent record in a post-*Romero* case, the presumption that a trial court ordinarily is presumed to have correctly applied the law should be applicable' "].) Therefore, the trial court's silence in this case is not a basis for reversal. With that being said, in the future, the better practice is for the trial court to *first* address its discretionary power under *Romero* and state on the record

whether it is exercising this discretion, and *then* proceed to sentencing. However, because we presume the trial court properly weighed the *Williams* factors even when the record is silent, we conclude the trial court properly exercised its discretion.

## **DISPOSITION**

For the foregoing reasons, the judgment is affirmed.


DE SANTOS, J.

WE CONCUR


POOCHIGIAN, Acting P. J.


SNAUFFER, J.